IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 10-090-1-SLR |
| | ) | |
| ABRAHAM FELICIANO-MELENDEZ, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

**I. INTRODUCTION**

On September 22, 2010, a federal grand jury returned a two-count indictment with notice of forfeiture against defendants Abraham Feliciano-Melendez and Carlos Vasquez on charges of conspiracy to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 849, and possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841 (a)(1), (b)(1)(B). (D.I. 11) Defendant Feliciano-Melendez[1] has moved to suppress evidence[2] seized, without a warrant, from a vehicle and residences on August 19, 2010. (D.I. 23, 24, 30) An evidentiary hearing was conducted on April 28, 2011 with the government presenting two law enforcement witnesses and defendant presenting one lay witness.

---

[1] Co-defendant Vasquez has not joined defendant's motion.

[2] Approximately 383 grams of heroin seized from a vehicle and 40.5 grams of heroin, $2,000 U.S. currency, drug paraphernalia and rounds of handgun ammunition seized from a house in Philadelphia, Pennsylvania. (D.I. 24)

(D.I. 36) The matter is fully briefed. (D.I. 39, 40, 41) The court has jurisdiction pursuant to 18 U.S.C. § 3231.

## II. FINDINGS OF FACTS

Pursuant to Federal Rules of Criminal Procedure 12(d), the following constitutes the court's essential findings of fact.

1. In June 2010, David Hughes,[3] a Special Agent with the United States Drug Enforcement Administration ("DEA") assigned to Wilmington, Delaware, commenced an investigation into narcotic trafficking in the Philadelphia, Pennsylvania area. (D.I. 36 at 4-5) With the assistance of a cooperating defendant ("CD"),[4] Hughes focused the investigation on heroin and cocaine dealing. (*Id.* at 6)

2. Hughes was in daily contact with the CD. (*Id.*) Because cooperating defendants typically have the opportunity to associate with targets of drug investigations at any time of day, Hughes provided the CD with a digital recording device ("the recorder") to facilitate the investigation. (*Id.* at 6-7) The recorder was capable of recording in-person and telephone conversations. The recorder did not have features to allow contemporaneous monitoring of any recorded conversations. (*Id.* at 8)

3. On August 10, 2010, the CD informed Hughes about individuals ("the sellers") willing to sell a large amount of heroin[5] to potential buyers in Delaware. The CD gave

---

[3]He has been a DEA special agent for almost 12 years. (*Id.* at 4)

[4]According to Hughes, the CD, facing unspecified charges in this court, was granted pre-trial release for the purpose of assisting DEA with the investigation at bar. (*Id.* at 5)

[5]The CD advised that it was a 400 gram heroin transaction. Based on the price of heroin ($75 to $80 a gram), the total price was approximately $30,000 to $32,000.

2

Hughes the sellers' phone numbers, but did not identify them. (*Id.* at 10) According to the CD, the sellers did not want to travel "deep into the State of Delaware" to consummate the deal. In response, Hughes instructed the CD to tell the sellers that there was a buyer who wanted to "set-up shop and develop a customer base for heroin" in Delaware. (*Id.* at 11) Hughes proposed (and the sellers agreed) to meet at a half-way point in the parking lot of a home improvement store, situated along the border between Pennsylvania and Delaware ("the home improvement store").

4. On August 18, 2010, the CD and Hughes spoke several times by phone, with the CD eventually informing that the sellers would travel to the home improvement store to consummate the transaction sometime the following day. (*Id.* at 12, 19) The CD recorded these conversations. (*Id.* at 12)

5. The next day, at approximately 11:30 a.m., the CD called Hughes to advise that the transaction would occur very soon. (*Id.* at 13) The CD said that he would be a passenger in a BMW with Pennsylvania license plates ("the BMW") driven by the sellers described as two Hispanic males. He also advised that the sellers would sell 350 grams of heroin, not 400 grams as originally negotiated, because the sellers sold some of the heroin earlier in the day to a buyer in Philadelphia. (*Id.* at 14-15)

6. In response, Hughes told the CD that law enforcement officers would set up surveillance and be posted at the home improvement store. Hughes said a certain make and model vehicle ("the staged car") would be parked in a designated area of the

---

(*Id.* at 9)

3

home improvement store's parking lot. The staged vehicle was supposed to represent the buyer's car awaiting the arrival of the sellers. (*Id.* at 13)

7. Surveillance commenced at 2 p.m. While awaiting the sellers' arrival, Hughes received numerous calls from the CD. During these calls, the CD pretended that he was calling the buyer with updates on their estimated time of arrival. (*Id.* at 15-16) At no time during these status update calls did anyone use the word "heroin," or any code words for heroin. (*Id.* at 31)

8. Shortly after receiving the final status call, Hughes observed the BMW approaching the designated location. (*Id.* at 17) The BMW pulled up and parked next to the staged vehicle. At that point, Hughes and five law enforcement officers[6] with weapons drawn converged on the BMW, opened the car doors, forcibly removed the occupants[7] and placed them face down on the ground. (*Id.* at 17, 36-38) They were then handcuffed, moved away from the BMW and subjected to two full searches. (*Id.* at 39-40) The CD told Hughes that the heroin was located in the BMW's trunk. (*Id.* at 18) Officers searched the trunk and discovered approximately 350 grams of heroin. (*Id.* at 19) Shortly thereafter, defendants were arrested and transported to the police station. (*Id.* at 40)

9. Sometime after the arrest, the CD told Hughes that he had observed contraband at defendant's residence on Clearfield Street in Philadelphia ("the Clearfield

---

[6]There were ten police officers, in plain clothes, and five or six unmarked police vehicles at the scene. (*Id.* at 33 - 34) Law enforcement officers wore tactical vests with "POLICE" across the chest. (*Id.* at 33)

[7]Hughes identified defendant Feliciano-Melendez as the driver, co-defendant Vasquez as a backseat passenger and the CD as the front seat passenger. (*Id.* at 18)

4

house"). (*Id.* at 42) Hughes also learned that defendant owned another residence on Frankford Street in Philadelphia ("the Frankford house"). (*Id.* at 19)

10. At about 10 p.m., Hughes and several officers[8] traveled to defendant's Clearfield house and found it was unoccupied. Next, they went to the Frankford house. (*Id.* at 44) Hughes and Taylor, in plainclothes and wearing identification badges, knocked on the front door. (*Id.* at 20) A woman ("YD")[9] answered and Hughes explained that defendant was under arrest for the distribution of a large amount of heroin. Hughes had never met YD before that encounter; he surmised she was defendant's spouse. YD invited Hughes and Taylor into her home.[10] (*Id.* at 45, 50) The other officers remained stationed outside. (*Id.* at 47-48)

11. Once inside, Hughes asked YD about the Clearfield house. From her responses, Hughes inferred that YD spoke and understood English. YD told Hughes that she and defendant owned the Clearfield house together and were in the process of refurbishing it. (*Id.* at 20) YD also denied any knowledge of drugs, weapons or contraband at the Clearfield house. (*Id.* at 21)

---

[8]Accompanying Hughes were FBI Special Agent Josh Taylor and, approximately, five federal agents and three Philadelphia narcotics detectives. (*Id.* at 46) None of the officers spoke Spanish nor was a Spanish interpreter taken along to the residences. (*Id.* at 46-47)

[9]The court finds the identity of this individual is irrelevant to the findings of fact and conclusions of law.

[10]Sometime later, Special Agent Randy Pfaff, a Wilmington, Delaware police detective assigned to the DEA Drug Task Force joined, Hughes inside the residence. (*Id.* at 51, 80)

5

12. Hughes then presented YD with a consent to search form ("the DEA form").[11] (*Id.* at 21; GX1) Hughes testified that he read the DEA form aloud to YD and asked if she had any questions. (D.I. 36 at 24) Hughes testified that YD did not have questions and signed the form without hesitation.[12] (*Id.* at 22-24)

13. Hughes described YD as surprised and concerned by the news of defendant's arrest and was particularly concerned about how the arrest would affect her children. (*Id.* at 21) She was polite and cooperative throughout the questioning and Hughes did not notice YD having any difficulty understanding or speaking English. (*Id.* at 22) Hughes estimated the encounter with YD inside the Frankford house lasted ten minutes. (*Id.* at 24)

14. After the form was signed, Hughes, YD and additional officers walked to the Clearfield house, which was only a few blocks away. (*Id.* at 24) When they reached Clearfield, Hughes testified that YD gave him a key to open the residence. Officers then conducted a search of the house, yard and a garage. (*Id.* at 26) Hughes remained with YD. During the extensive search, officers discovered heroin, cash and

---

[11]The DEA form, entitled "Consent to Search Form 88," is issued and pre-printed by the U.S. Department of Justice, and provides:
    **1. I have been asked to permit special agents of the drug enforcement administration to search: (Describe the person, places or things to be searched.)** Hughes testified that underneath the prepared language (bolded above) he wrote in the addresses of the Clearfield and Frankford houses. Immediately under the description provided by Hughes, the form continues:
    **2. I have not been threatened, nor forced in any way.**
    **3. I freely consent to this search.**
Lines for the date and signature are followed by lines for two witnesses to sign. (GX1) (emphasis added to illustrate the pre-printed portions).

[12]The form is dated "08/19/2010, 10:22 p.m.," signed by YD and witnessed by Hughes and Taylor. (GX1)

6

materials used to manufacture and distribute heroin. Officers showed YD the contraband; she, in turn, asked Hughes a lot of questions. (*Id.* at 27) At no time, did YD withdraw her consent to the search.

15. Hughes, YD and other officers returned to the Frankford house to search the residence, particularly defendant's bedroom. (*Id.* at 27) After discovering some documents in the bedroom, Hughes discontinued the search. (*Id.* at 28) Hughes believed YD was being honest and, before leaving, they exchanged phone numbers.

16. YD testified,[13] offering a somewhat different account of the encounter with Hughes. (*Id.* at 54) YD arrived from Argentina in 2001, is now 31 years old and a permanent resident of the United States. (*Id.* at 55) YD testified that her primary language is Spanish and that she speaks mostly Spanish. (*Id.* at 65) She completed high school in Argentina and is employed at a bakery where most of the customers speak Spanish. (*Id.* at 55) In the bakery, YD does not deal with forms written in English. When she applied for permanent resident status, YD completed forms (written in English) with someone's assistance. (*Id.* at 71) YD has never been convicted of a crime nor had any experience with the criminal justice system. (*Id.* at 64) Prior to defendant's arrest, YD and her two children lived with him at the Frankford house. (*Id.* at 67)

17. YD testified that on August 19, 2010 at about 9:00 p.m., Hughes and other officers arrived at the Frankford house while she was watching television. (*Id.* at 55)

---

[13]YD testified without the assistance of a Spanish interpreter. Although YD stated she was missing a lot of words spoken during the suppression hearing, she was able to answer questions. (*Id.* at 66) A Spanish interpreter was present and translating for defendant throughout the hearing.

7

She invited Hughes inside, after he inquired about the defendant. YD testified that she understood Hughes when he told her that defendant had been arrested on drug charges. (*Id.* at 56, 69) She recalled Hughes showing her the DEA form,[14] but that Hughes did not explain what the form meant. (*Id.* at 70) When shown the DEA form at the suppression hearing, YD had difficulty reading because she did not have her reading glasses.[15] She testified, repeatedly, that she did not understand the meaning of

---

[14]Prior to August 19, 2010, YD had never seen a DEA consent to search form. (*Id.* at 69)

[15]In response to further inquiry from the court, YD explained that the problem was she did not understand English rather than an inability to read the words without the benefit of her reading glasses. (*Id.* at 73)

the words on the form.[16] She admitted that the signature on the form was her own. (Id. at 75)

18. She testified that Hughes said the form would give police permission to look around the house and, if she refused to sign, that meant she had something to hide. (Id. at 60) According to YD, Hughes asked to see her passport and then copied the information from the passport. At no time did anyone ask YD whether she spoke Spanish or needed an interpreter. YD explained that she signed the DEA form because she was scared and thought she would get into trouble or go to jail if she did not sign.

---

[16]Specifically,
Q: Go ahead. Now, try, where I pointed before, try to read that again (handing exhibit to the witness).
A: I have been asked to permit special agent of the drug enforcement administrator to search. Describe the person, place or thing to be searched.
Q: Turn the paper around. Turn it around. Don't look at it. What does it say? What did that just say?
A: I don't know.
Q: Do you understand what you just read?
A: It's asking for something, but I don't know what that means.
Q: You don't understand what it means?
A: No
Q: Okay. Turn it back over. Read where it says 1 and where it says 2.
A: One is my address. 2114 East Clearfield Street.
Q: Okay. You recognize that?
A: Yes.
Q: No. 2?
A: My old address, 3035 Frankford Avenue.
Q: Okay. Turn the paper over. Now, having read those two things, what [does] that all mean? Those sentences just read, what does it all mean?
A: My home, my address.
Q: What else? Anything else? And if you don't know, that's okay. Tell us what you think it means.
A: It's about my apartment and my home.
Q: What about it?
A: I don't know.
(Id. at 58-59)

(*Id.* at 64-65) She further stated that she believed the form gave permission to search the Frankford house only and that she did not give permission to search the Clearfield house. (*Id.* at 75)

19. YD acknowledged accompanying Hughes and officers to the Clearfield house. On their arrival, YD said the house was open and the search was already in progress. She did not recall giving officers a key to the house. YD was shown the contraband discovered by officers. When they returned to the Frankford house, YD said that Hughes was looking in the bedroom for a title to a car. (*Id.* at 61)

20. Agent Pfaff testified that he was present in the Frankford house when Hughes discussed the DEA form with YD. (*Id.* at 81-82) From his vantage point in a common hallway, Pfaff heard Hughes explain the DEA form and did not observe any problems during the conversation. YD appeared to understand Hughes and seemed polite and concerned. (*Id.* at 82) Pfaff accompanied Hughes and YD to the Clearfield house[17] and, after the search, returned with them to the Frankford house. (*Id.* at 85) At no time did Pfaff observe YD withdraw her consent to the searches or express any concern about the searches. (*Id.* at 83, 86)

## III. STANDARD OF REVIEW

1. Once a defendant challenges the legality of a warrantless search and seizure, the burden is on the government to demonstrate, by a preponderance of the evidence, that the acts are constitutional. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.

---

[17] Pfaff testified in accordance with Hughes that the Clearfield house was secured and that they used YD's key to open the house. (*Id.* at 86) She testified that she did not have a key.

10

1995); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

2. The court is charged with reviewing the credibility of witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence. *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir.1993); *United States v. Williams*, 400 F. Supp.2d 673 (D. Del. 2005).

## IV. DISCUSSION

### A. Search of the BMW

1. Defendant contends there were no exigent circumstances present to support the warrantless search of the BMW. (D.I. 39) He avers that *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), requires the court to apply a conjunctive test, that is, to consider whether there was probable cause and whether the suspect was able to access the vehicle. (D.I. 41)

3. The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. Amend. IV. A search and seizure made pursuant to a warrant based on probable cause is generally reasonable. *Katz v. United States*, 389 U.S. 347, 356-357 (1967). However, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, __ U.S. ___, ___, 129 S.Ct. 1710, 1716 (2009) (quoting *Katz v. United States*, 389 U.S. at 357; *United States v. Hartwell*, 436 F. 3d 174, 177 (3d Cir. 2006) . Evidence obtained pursuant to a

warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006).

4. The automobile exception to the warrant requirement permits law enforcement to search an automobile without a warrant if "probable cause exists to believe it contains contraband." *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996); *United States v. Burton*, 288 F. 3d 91, 100 (3d Cir. 2002). The automobile exception does not require exigent circumstances. *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (the ready mobility of automobiles permits their search based only on probable cause); *Labron*, 518 U.S. at 940. The automobile exception applies whenever a vehicle is "readily capable" or "being used on the highways" and "is found stationary in a place not regularly used for residential purposes." *California v. Carney*, 471 U.S. 386, 392 (1985); *United States v. Johns*, 469 U.S. 478, 484 (1984).

5. Probable cause to search a vehicle exists when the totality of the circumstances reasonably demonstrate that evidence of criminality is contained in the vehicle. *Maryland v. Dyson*, 527 U.S. 465, 467 (1982).

6. Considering the totality of the circumstances and, in so doing, finding credible the testimony of Special Agent Hughes, the court concludes that the officers had probable cause to search the BMW based on a reasonable belief that it contained heroin. Specifically, the information gathered and recorded by the CD revealed that certain sellers of heroin were willing to sell a large amount of heroin to Delaware buyers. A date and location were agreed upon for the transaction. The CD's

description of the vehicle they would be driving (the BMW) was corroborated by law enforcement officers and surveillance when it arrived at the pre-arranged, designated location (the home improvement store).

## B. Search of Houses

1. Defendant contends that the search of the houses was involuntary because YD signed the DEA consent to search form out of fear that she would go to jail or get into trouble if she did not sign.

2. Generally, a warrantless entry into a person's house is per se unreasonable and, therefore, a violation of the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 586 (1980). "[O]ne 'jealously and carefully drawn' exception . . . recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citations omitted). The validity of a purported search consent is contingent upon whether the consent was given voluntarily. The issue of voluntariness is extremely fact-intensive and depends on the totality of the circumstances, including the characteristics of the consent-giver and the details of the questioning. Id. At 226. The Third Circuit has identified some factors to consider, e.g.,

> the age, education and intelligence of the (subject or consent giver); whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning, and the use of physical punishment. We have further identified as relevant the setting in which the consent was obtained [and] the parties' verbal and nonverbal actions.

*United States v. Price*, 558 F. 3d 270, 278 (3d Cir. 2009) (citations and quotations omitted).

13

3. The government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). The burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983).

4. Having considered the totality of the record and carefully weighing the testimony of Hughes, Pfaff and YD, the court concludes that consent to search (as manifested by the DEA consent to search form signed by YD) was voluntarily given. In so doing, the court finds that all three witnesses testified credibly, however, the corroborated testimony of Hughes and Pfaff was more compelling.

5. Moreover, weighing in favor of concluding that YD's consent was voluntary is the following: (1) YD, a high school graduate, has lived in the United States since 2001 and is gainfully employed in the workforce at a bakery; (2) YD was able to respond to questions posed by the court and counsel during the suppression hearing; (3) YD did not ask for the assistance of an interpreter during the suppression hearing, although one was present and translating for defendant; and (4) even assuming that YD did not understand what the DEA form meant when she signed at the Frankford house, it is incredible to believe that she did not understand what officers were doing when the search commenced at the Clearfield house. Significantly, the record does not reflect that YD made any attempt to stop or even question the search as she watched officers looking over her property, discovering contraband and then presenting the contraband to her as she stood with Hughes.

6. On the other hand, one factor weighs against a conclusion that YD's consent was voluntary: she was scared and thought she would get into trouble or go to jail if

she did not sign. Coupled with the questions regarding her citizenship and request to see her passport, it is reasonable to surmise that she felt pressured to sign the form. However, the record does not support a finding that any pressure was so extreme as to overcome her free will. To that end, the court notes the absence of any suggestion that Hughes or any officer used a coercive show of authority, or physical or implied threats at any time while with YD. *Compare United States v. Wein*, No. 05-CR-317, 2006 WL 2128155, at *4 (W.D. Pa. July 27, 2006) (court held that the defendant's consent was involuntary because he was so fearful that he felt that he had no choice but to cooperate).

## V. CONCLUSION

At Wilmington this 29th day of June, 2011,

IT IS ORDERED that:

1. Defendant's motion to suppress (D.I. 24) is **denied.**

2. A telephone status conference is scheduled to commence on **Thursday, July 7, 2011** at **9:30 a.m.**, with the court initiating said call.

3. The time between this order and the teleconference shall be excludable under the Speedy Trial Act in the interests of justice, 18 U.S.C. § 3161, et seq.

_____
United States District Judge